[Cite as *In re L.M.*, 2021-Ohio-395.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

IN RE: L.M.

:
:
:
:
:
:
:
:
:
:
:
:

Appellate Case No. 28846

Trial Court Case No. 2018-4136

(Appeal from Common Pleas Court-
Juvenile Division)

. . . . . . . . . . .

O P I N I O N

Rendered on the 12th day of February, 2021.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by SARAH E. HUTNIK, Atty. Reg. No. 0095900, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
     Attorney for Appellee, Montgomery County Children Services

P.J. CONBOY, II, Atty. Reg. No. 0070073, 5613 Brandt Pike, Huber Heights, Ohio 45424
     Attorney for Appellant, Father

. . . . . . . . . . . . .

WELBAUM, J.

**{¶ 1}** Father appeals from a judgment of the Montgomery County Court of Common Pleas, Juvenile Division, which terminated his parental rights and granted permanent custody of his son, L.M., to Montgomery County Children Services ("MCCS"). For the reasons outlined below, the judgment of the trial court will be affirmed.

### Facts and Course of Proceedings

**{¶ 2}** In April 2018, MCCS received a report that L.M. had been born with withdrawal symptoms and had tested positive for opiates and marijuana at birth. As a result, MCCS was concerned that L.M.'s mother ("Mother") was actively using drugs. Due to this concern, MCCS implemented a safety plan whereby L.M. was looked after by his paternal grandmother ("Paternal Grandmother"). Pursuant to the safety plan, Mother was only allowed to have supervised contact with L.M.

**{¶ 3}** In June 2018, Mother disrupted the safety plan by taking L.M. from Paternal Grandmother's home without permission. Thereafter, MCCS implemented a second safety plan that required either Paternal Grandmother or Father to supervise Mother's contact with L.M. On July 11, 2018, Father violated the second safety plan by taking L.M. from Paternal Grandmother's home without permission and delivering L.M. to Mother.

**{¶ 4}** On July 20, 2018, after Paternal Grandmother had not seen Father or L.M. for several days, Paternal Grandmother received a call from Mother asking her to pick up L.M. After picking up L.M., Paternal Grandmother became concerned with L.M.'s eating habits and took L.M. to the hospital. L.M. was then diagnosed with non-organic failure to thrive.

{¶ 5} On July 26, 2018, MCCS filed a neglect and dependency complaint and a motion for interim temporary custody of L.M. The trial court dismissed MCCS's complaint because it could not be adjudicated within the statutorily required time frame. The trial court did, however, grant MCCS interim temporary custody of L.M.; MCCS placed L.M. in a foster home.

{¶ 6} On August 21, 2018, MCCS refiled the neglect and dependency complaint. The refiled complaint alleged that Mother and L.M. had tested positive for opiates and marijuana at the time of L.M.'s birth. The complaint also alleged that Mother tested positive for cocaine, amphetamines, and marijuana in March 2018.

{¶ 7} On September 28, 2018, the trial court issued a decision adjudicating L.M. as a dependent and abused child. The trial court also granted MCCS temporary custody of L.M. MCCS then created case plans for Mother and Father that addressed the concerns that led to L.M.'s removal from their care. The goal of the case plans was to reunify the family.

{¶ 8} Over the next several months, MCCS became unsatisfied with Mother's and Father's progress on their case plans. Therefore, on June 25, 2019, MCCS filed a motion requesting that the trial court grant MCCS permanent custody of L.M. After several continuances, the trial court held a permanent custody hearing on January 31, 2020. Mother and Father did not attend the permanent custody hearing, but their respective counsels were in attendance. Also in attendance were L.M.'s foster mother ("Foster Mother") and MCCS caseworkers John Stringer and Brooke Bambauer. Foster Mother, Stringer, and Bambauer testified at the hearing and provided the following information.

*Foster Mother*

**{¶ 9}** Foster Mother testified that she and her husband had been L.M.'s foster parents for 18 months and began caring for L.M. when he was only three months old. Foster Mother also testified that L.M. refers to them as "Mommy" and "Daddy," that she and her husband were bonded to L.M., and that L.M. also shared a bond with their two biological children.

**{¶ 10}** Foster Mother indicated that when L.M. was first placed in her home, she had to seek medical treatment for him because he had been diagnosed with failure to thrive and only weighed eight pounds five ounces. Shortly after being placed with Foster Mother, L.M. also contracted a respiratory virus, but he recovered after spending 15 days in the hospital. Foster Mother testified that L.M. had also been hospitalized for nine days in December 2018, due to asthma. Since that time, Foster Mother testified that L.M. had been healthy. Foster Mother testified that L.M. was in the 50th percentile for weight and was no longer diagnosed with failure to thrive at the time of the hearing.

**{¶ 11}** Foster Mother additionally testified that she and her husband both work outside the home and that L.M. attends a five-star, private daycare center. On the weekends, Foster Mother testified that she and her husband take L.M. to the park or playground and go to church on Sundays. Foster Mother testified that she considers L.M. to be her child and that she and her husband would like to adopt L.M.

*John Stringer*

**{¶ 12}** Stringer testified that he was the MCCS caseworker assigned to L.M.'s case between July 2018 and April 2019. Stringer testified that MCCS created case plans for both Mother and Father to address the concerns that led to L.M.'s removal from their care. Father's initial case plan objectives were to maintain housing, maintain income, and participate in parenting classes; a parenting psychological assessment was later added to Father's case plan.

**{¶ 13}** With regard to the case plan objectives, Stringer testified that Father never completed any parenting classes and never provided MCCS with any verification of employment or income. According to Stringer, this led to concerns about whether Father would be able to maintain housing and provide for L.M.

**{¶ 14}** Stringer also testified that despite Father specifically requesting visitation every Monday and Friday between 3pm and 5pm, Father did not consistently visit L.M. Stringer testified that between August 2018 and May 2019, Father had 82 opportunities to visit L.M., but only visited the child eight times. Stringer testified that Father claimed he could not visit L.M. due to work or transportation issues. Stringer testified that MCCS offered Father bus passes to help with transportation, but that Father did not take advantage of the offer.

**{¶ 15}** Relating to Mother, Stringer testified that Mother's case plan objectives included finding and maintaining housing, finding and maintaining legal income, and completing drug, alcohol, mental health, and parenting psychological assessments. In addition, Mother was expected to complete any recommendations following her assessments.

**{¶ 16}** Concerning these objectives, Stringer testified that he had been unable to

verify whether Mother ever obtained stable housing or employment. Stringer also testified that Mother completed two drug and alcohol assessments in 2018, but did not engage in any follow-up recommendations. According to Stringer, Mother also refused random drug screens, which MCCS considered to be a positive result for drug use. Stringer testified that he was unsure whether a mental health assessment was conducted with Mother's drug and alcohol assessments in 2018, but that Mother did admit herself into Kettering Hospital to address her mental health issues. Stringer testified that, after her release from the hospital, Mother told him that she was going to go "to Haven for services," Hearing Trans. (Jan. 31, 2029), p. 34, but she never went to Haven and never engaged in any follow-up care to address her mental health issues. Mother's visitation with L.M. was also very infrequent and inconsistent.

*Brooke Bambauer*

{¶ 17} Bambauer testified that she had been the MCCS caseworker assigned to L.M.'s case since April 2019. Bambauer testified that a parenting psychological assessment was added to Mother's and Father's case plans when she was first assigned to the case. Bambauer testified that Mother and Father completed the parenting psychological assessment on July 18, 2019; the results of the assessments were inconclusive due to lie detecting, defensiveness, and inconsistent answers.

{¶ 18} As a result of the parenting psychological assessment, Bambauer testified that MCCS recommended that Mother complete a drug and alcohol assessment, one year of parenting classes, two years of weekly specialized treatment for her personality disorder, and two years of weekly individual psychotherapy. For Father, MCCS

recommended that he complete one year of parenting classes and six months of group and individual psychotherapy. Bambauer testified that Mother and Father did not complete these objectives. Although Father told Bambauer that he was going to a parenting class at the Reibold Building, Father did not provide Bambauer with any verification of his attendance.

{¶ 19} Bambauer testified that on May 13, 2019, she completed a home visit with Mother and Father at a residence they were renting in Fairborn, Ohio. Bambauer testified that she had no concerns with the condition or safety of the home. During the home visit, Mother advised Bambauer that Mother was engaged in Addiction Services for her substance abuse and mental health issues. Bambauer testified, however, that when she contacted Addiction Services she was informed that Mother's case had been closed in March 2019 due to non-compliance.

{¶ 20} Also during the home visit, Mother reported to Bambauer that she was working at Taco Bell and Burger King, but Mother never provided any verification of that employment. Father reported to Bambauer that he was working at Modern Safe, but he also failed to provide Bambauer with any verification of his employment. Bambauer testified that Father later advised that he was working at KFC, but did not provide any verification of that employment either.

{¶ 21} After the May 13th home visit, Bambauer testified that she attempted to have more visits with Mother, but was unsuccessful in making contact with her. Bambauer indicated that she had no contact with Mother until Mother was arrested and jailed on drug charges in August 2019. Bambauer testified that, other than a short release on bond during which Mother failed to comply with the conditions of her release,

Mother had been incarcerated since that time and was expected to be released approximately six months from the date of the permanent custody hearing.

**{¶ 22}** Bambauer testified that she last spoke with Mother a few weeks prior to the permanent custody hearing. According to Bambauer, Mother was aware of the hearing and she recognized that she had wasted the time she was given to complete her case plan objectives. Bambauer testified that Mother reported attending group sessions for drug counseling, but noted that this was the only case plan objective Mother has been able to work on since her incarceration.

**{¶ 23}** Concerning Father, Bambauer testified that following the May 13th home visit, the only other time she had contact with Father was a few weeks prior to the permanent custody hearing. Bambauer also testified that Father did not have his paternity of L.M. officially established until September 2019. Bambauer testified that MCCS did not feel that Father was ready to reunify with L.M. because his case plan had not been completed and he had not actively participated in his case plan.

**{¶ 24}** Continuing, Bambauer testified that while she had been the assigned caseworker, Mother and Father had only visited L.M. one time in April 2019. Bambauer testified that the lack of visitation caused concerns relating to Mother and Father's bond with L.M. Bambauer testified that she had visited L.M.'s foster home and had observed a bond between L.M. and his foster parents. Bambauer testified that L.M.'s needs were being met by his foster parents and that his foster parents wanted to adopt him.

**{¶ 25}** With regard to relative placement options, Bambauer testified that Father provided his brother as a potential caretaker for L.M. According to Bambauer, that placement option was denied due to Father's brother having a recent criminal and child

welfare history. Bambauer also stated that Paternal Grandmother was initially adamant about being a placement option. Although MCCS was concerned about placing L.M. with Paternal Grandmother due to the prior safety plan violations, Bambauer testified that she provided Paternal Grandmother with her contact information to begin the home study/placement process. Bambauer testified, however, that Paternal Grandmother never contacted her to begin the process.

{¶ 26} In addition to the foregoing testimony, L.M.'s guardian ad litem filed a report recommending that permanent custody be granted to MCCS. In the report, the guardian ad litem expressed that granting MCCS permanent custody was in L.M.'s best interest.

*Grant of Permanent Custody*

{¶ 27} On February 27, 2020, the presiding magistrate issued a decision granting permanent custody of L.M. to MCCS. Father then filed objections to the magistrate's decision and requested leave to file supplemental objections following the preparation of a transcript of the permanent custody hearing. The trial court granted the requested leave and Father filed his supplemental objections on April 24, 2020.

{¶ 28} On June 23, 2020, after conducting an independent review of the matter, the trial court issued an order overruling Father's objections and adopting the magistrate's decision to grant MCCS permanent custody of L.M. In so holding, the trial court found by clear and convincing evidence that: (1) L.M. cannot and should not be placed with either parent within a reasonable period of time; and (2) granting MCCS permanent custody was in L.M.'s best interest.

{¶ 29} Father now appeals from the trial court's decision granting MCCS

permanent custody of L.M., raising a single assignment of error for review. Mother is not a party to this appeal.

## Assignment of Error

{¶ 30} Under his assignment of error, Father contends that the trial court abused its discretion in granting MCCS permanent custody of L.M. We disagree.

{¶ 31} Parents have essential and basic rights to conceive and raise children, but these fundamental rights are not absolute. *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 39-40; *In re D.A.*, 113 Ohio St.3d 88, 2007-Ohio-1105, 862 N.E.2d 829, ¶ 11. The "government has broad authority to intervene to protect children from abuse and neglect." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 28, citing R.C. 2151.01.

{¶ 32} In Ohio, R.C. 2151.414 governs the termination of parental rights. *In re N.C.*, 2d Dist. Montgomery Nos. 28105, 28117, 2019-Ohio-567, ¶ 56-57. Section (B)(1) of the statute provides a two-part test for courts to apply when determining whether to grant a motion for permanent custody to a public services agency. *In re R.L.*, 2d Dist. Greene Nos. 2013-CA-46, 2013-CA-50, 2014-Ohio-3955, ¶ 7. The statute requires the trial court to find by clear and convincing evidence that: (1) an award of permanent custody to the agency is in the child's best interest; and (2) any one of the following factors enumerated in R.C. 2151.414(B)(1)(a)-(e) exist:

(a)     * * * [T]he child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b)     The child is abandoned.

(c)     The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d)     The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.

(e)     The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

R.C. 2151.414(B)(1)(a)-(e).

{¶ 33} When making the best-interest determination, R.C. 2151.414(D)(1) requires the trial court to consider all relevant factors, including but not limited to the following:

(a)     The interaction and interrelationship of the child with the child's parents, relatives, foster parents and any other person who may significantly affect the child;

(b)     The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c)     The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or

more months of a consecutive twenty-two-month period;

(d)     The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and

(e)     Whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable.

R.C. 2151.414(D)(1)(a)-(e).

{¶ 34} The findings under R.C. 2151.414(B)(1) and (D)(1) must be supported by clear and convincing evidence. *In re K.W.*, 2d Dist. Clark No. 2013-CA-107, 2014-Ohio-4606, ¶ 7. The Supreme Court of Ohio has defined "clear and convincing evidence" as "[t]he measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal*." In re Estate of Haynes*, 25 Ohio St.3d 101, 104, 495 N.E.2d 23 (1986).

{¶ 35} "The [trial] court's decision to terminate parental rights * * *will not be overturned * * * if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established." (Citations omitted). *In re A.U.*, 2d Dist. Montgomery No. 22264, 2008-Ohio-186, ¶ 15. "On review, we give the trial court's final determination 'the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned.' " *In the Matter of G.B.*, 2d Dist. Greene No. 2017-CA-30, 2017-Ohio-8759, ¶ 8, quoting *In re*

*Alfrey*, 2d Dist. Clark No. 2001-CA-83, 2003-Ohio-608, ¶ 102.   The trial court's decision will not be reversed absent an abuse of discretion.   *In re E.D.*, 2d Dist. Montgomery No. 26261, 2014-Ohio-4600, ¶ 7, citing *C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, at ¶ 48.

{¶ 36} As noted above, when granting MCCS permanent custody of L.M., the trial court applied the two-part test in R.C. 2151.414 and found that: (1) L.M. cannot be placed with either parent within a reasonable time or should not be placed with either parent; and (2) granting MCCS permanent custody was in L.M.'s best interest.   We will now review each of these findings.

*(1) Cannot Be Placed With Either Parent Within a Reasonable Time or Should Not Be Placed With Either Parent*

{¶ 37} In determining whether a child cannot be placed with either parent within a reasonable time or should not be placed with either parent, the trial court must consider all relevant evidence.   R.C. 2151.414(E).   If the trial court finds, by clear and convincing evidence, that one or more of 16 enumerated factors in R.C. 2151.414(E) exists, then the trial court shall find that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent.   *In the Matter of R.H.,* 2d Dist. Clark No. 2016-CA-68, 2017-Ohio-4012, ¶ 13.

{¶ 38} In this case, the trial court found that the factor under R.C. 2151.414(E)(1) applied to Father.   The (E)(1) factor is stated as follows:

Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency

to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

R.C. 2151.414(E)(1).

{¶ 39} Upon review, we find that the application of factor (E)(1) is supported by clear and convincing evidence in the record. The record establishes that Father repeatedly failed to substantially remedy the conditions that caused L.M. to be removed from his and Mother's care. Specifically, Father failed to make substantial progress in completing his case plan objectives with MCCS. For well over a year, Father continuously failed to provide verification of income and employment, and thus failed to establish that he could financially provide for L.M.'s needs. Father also failed to complete the required parenting classes and failed to follow through on any referrals following his parenting psychological assessment. Father also failed to regularly visit L.M. Therefore, we find clear and convincing evidence establishing the factor under R.C. 2151.414(E)(1).

{¶ 40} The trial court also found that the factor under R.C. 2151.414(E)(4) applied to Father. The (E)(4) factor is stated as follows:

The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child[.]

R.C. 2151.414(E)(4).

{¶ 41} Upon review, we also find clear and convincing evidence supporting factor (E)(4). The record indicates that between July 2018 and April 2019, Father only attended 8 out of 82 possible visits with L.M. At the time of the permanent custody hearing, neither parent had visited or attempted to contact L.M. since April 19, 2019. Therefore, at the time of the permanent custody hearing, Father had not seen L.M. for nine months. Although Father claimed he was prevented from visiting L.M. due to transportation issues, he did not take advantage of bus passes offered by MCCS. Based on the foregoing, we find that there was clear and convincing evidence in the record establishing the factor under R.C. 2151.414(E)(4).

{¶ 42} Given that one or more of the 16 factors under R.C. 2151.414(E) applied in this case, the trial court did not abuse its discretion in finding that L.M. could not be placed with Father within a reasonable time or should not be placed him. Therefore, for the reasons set forth above, this portion of the two-part test in R.C. 2151.414 was satisfied.

### (2) Best Interest of Child

{¶ 43} After weighing all the factors under R.C. 2151.414(D)(1)(a) through (e), the trial court found that granting permanent custody to MCCS was in L.M.'s best interest. For the following reasons, this decision was not an abuse of discretion.

*(a) Interaction/Interrelationship with Parents, Relatives, Foster Parents:*

**{¶ 44}** Father had had little interaction with L.M. since his birth. As previously noted, between July 2018 and April 2019, Father only attended 8 out of 82 possible visits with L.M. L.M.'s last contact with either parent occurred nine months prior to the permanent custody hearing. There was no evidence that either parent or any of their relatives had a bond with L.M. A bond did exist, however, between L.M. and his foster family. L.M. called his foster parents "Mommy" and "Daddy" and he had a loving relationship with them and their two biological children. L.M.'s foster parents considered L.M. to be their child and wanted to adopt him. This factor weighed in favor of granting MCCS permanent custody.

*(b)      L.M.'s Wishes:*

**{¶ 45}** L.M. was only two years old at the time of the permanent custody hearing; therefore, he was too young to express his wishes with regard to custody. This factor was neutral.

*(c)      Custodial History/ Whether Child was in the Temporary Custody of One or More Public Children Services Agencies for Twelve or More Months of a Consecutive Twenty-Two-Month Period:*

**{¶ 46}** When MCCS filed its permanent custody motion, L.M. had not been in the temporary custody of MCCS for 12 or more months of a consecutive 22-month period. However, after two failed safety plans, L.M. was placed in the temporary custody of MCCS when he was only three-months old. L.M. was then placed with a foster family, with whom he had lived ever since. Because L.M. had been in the temporary custody of MCCS for most of his life, this factor weighed in favor of granting permanent custody to

MCCS.

(d) *Need for Permanent Placement/Type of Placement that Can Be Achieved Without Granting MCCS Permanent Custody:*

{¶ 47} The record indicates that Father failed to make substantial progress on his case plan objectives with MCCS. Father failed to provide verification of income and employment, failed to attend parenting classes, and failed to complete any referrals following his parenting psychological assessment. Father had only visited L.M. eight times since L.M. was placed in MCCS's care, and has not seen L.M. since April 2019. Due to the lack of visitation, Father has no significant relationship or bond with L.M.

{¶ 48} The record indicates that there were no viable or willing relative placement options for L.M. Father's brother was not eligible due to having a recent criminal and child welfare history. Although Paternal Grandmother initially expressed interest in being a placement option, she failed to contact MCCS to proceed with the placement process. In addition, Paternal Grandmother was involved in two failed safety plans. Therefore, for all the foregoing reasons, this factor indicates that L.M. was in need of legally secure permanent placement that could only be achieved by granting permanent custody to MCCS.

(e) *R.C. 2151.414(E)(7)-(11) Factors*

{¶ 49} None of these factors apply to the instant case. Accordingly, these factors are neutral.

{¶ 50} In light of the foregoing, and after weighing the relevant factors under R.C. 2151.414(D)(1), we cannot say that the trial court abused its discretion in finding that it was in L.M.'s best interest to award permanent custody to MCCS, as there was clear and

convincing evidence in the record to support that decision.

{¶ 51} In conclusion, our review of the record shows that there was competent, credible evidence from which the trial court could have clearly and convincingly found that both parts of the two-part test in R.C. 2151.414(B) had been satisfied. Therefore, the trial court's decision granting MCCS permanent custody of L.M. was not an abuse of discretion. Accordingly, Father's assignment of error is overruled.

## Conclusion

{¶ 52} Having overruled Father's sole assignment of error, the judgment of the trial court is affirmed.

. . . . . . . . . . . .

TUCKER, P.J. and HALL, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Sarah E. Hutnik
P.J. Conboy, II
Hon. Helen Wallace